THE STATE, HANNAH E. RANDOLPH AND ANNIE E. BRON-
SON ET AL., PROSECUTORS, v. THE BOARD OF CHOSEN
FREEHOLDERS OF THE COUNTY OF UNION ET AL.

Argued November 1, 1898—Decided December 6, 1898.

1. The act of June 13th, 1898 (*Pamph. L.*, *p.* 461), entitled "An act to
authorize boards of chosen freeholders to widen, straighten, grade and
otherwise improve highways under their control, and to provide for
the construction of street railroads thereon," is not rendered special or
local by the provision that nothing in the act "shall be construed to
authorize the construction of a street railroad on any public highway
on which it is not lawful at present to authorize the construction of a
street railroad."

2. The direction contained in said act, that commissioners, appointed on
condemnation of lands taken for the purpose of widening, straighten-
ing or changing location of a highway, in making their estimate and
assessment of damages, "shall take into account the benefits conferred
by the improvement on the remainder of any lot or tract of land partly
taken," is not unconstitutional.

3. The fact that a street railroad company, with which a board of chosen
freeholders has made a contract under said act to construct a street
railroad upon a public highway under its control, has no franchise,
apart from such contract, to construct or operate a street railroad upon
such highway, does not give a taxpayer owning land upon the high-
way, a standing to attack the contract.

On application for writs of *certiorari.*

"An act to authorize boards of chosen freeholders to widen,
straighten, grade and otherwise improve highways under their
control, and to provide for the construction of street railroads
thereon" was approved June 13th, 1898.   *Pamph. L.*, *p.* 461.

Section 1 empowers the board of chosen freeholders of any
county in this state to widen, straighten, change the grade or
location of or otherwise improve any public highway under
its control or part thereof, and to authorize the construction
and operation of a street railroad thereon; and after making
and filing in the office of the clerk of the county a map show-
ing the proposed widening, straightening or change of location

of any such highway, to acquire by purchase or condemnation any real estate that may be necessary for that purpose. In case of condemnation, commissioners are to be appointed by the Circuit Court of the county to make an estimate and assessment of the damages that any owner of land taken will sustain by the taking of his land, and it is provided that " in making such estimate and assessment of damages the said commissioners shall take into account the benefits conferred by the improvement on the remainder of any lot or tract of land partly taken."

Section 2 provides that whenever any such board intends to widen, straighten, change the grade or location of or otherwise improve any public highway under its control or part thereof, in order to provide for the construction and convenient operation of a street railroad thereon that fact shall be stated in a resolution, passed by the board after filing said map, and published for at least two weeks once a week, in two or more newspapers published in the county; and that such resolution shall further state that at the time and place to be mentioned propositions to construct, maintain and operate a street railroad on the highway to be improved will be considered by the board, and that all parties interested therein may be heard. It is then provided that propositions submitted in pursuance of such notice shall state (1) whether the railroad proposed is to be single or double track and if single the length and location of sidings and switches; (2) the motive power to be used; (3) the rate of fare to be charged; (4) the amount of money to be contributed for defraying the cost of improving the public highway as proposed by the board, and the amount, or percentage of receipts, to be paid annually for the franchise; and (5) such other terms as the party making the proposition may be willing to agree to. It is then provided that if any proposition shall be accepted by the board, security shall be given for its faithful performance before any money shall be expended or obligation incurred in making the proposed improvement. It is also provided that no franchise shall be granted under the act for a longer term than

seventy-five years, and that the consent in writing of the owners of at least one-half in amount of lineal feet of property fronting on such highway in each municipality shall be procured and filed in the office of the county clerk before the construction of the railroad, and if not so filed within six months the proposition shall be void and the freeholders may give notice calling for other propositions. This section contains the following clause: "Nothing in this act shall be construed to authorize the construction of a street railroad on any public highway on which it is not lawful at present to authorize the construction of a street railroad."

Section 3 directs that the assent of the governing body of every municipality in the county through or into which it is proposed to construct the street railroad must be procured before the construction is commenced.

Section 4 provides for the awarding of contracts for work or materials required by the act.

Section 5 fixes the compensation of the commissioners in condemnation.

Section 6 authorizes the borrowing of money by the freeholders on county bonds for the purpose of widening, straightening, changing the grade or location of or otherwise improving such highway.

Section 7 declares that all inconsistent laws are repealed, and that the act shall take effect immediately.

On July 14th, 1898, the board of chosen freeholders of the county of Union adopted the following resolutions:

"*Resolved,* That it is the intention of this board to widen, straighten and change the grade and otherwise improve Westfield or North avenue, between Orchard street in the city of Elizabeth and Richmond street in the city of Plainfield, in order to provide for the construction and convenient operation of a street railroad thereon; said proposed widening, straightening and change of location being shown on a map, consisting of fifteen sheets, this day adopted and filed in the office of the clerk of the county; and be it further

"*Resolved*, That propositions to construct, maintain and operate a street railroad on North avenue, from Orchard street, in the city of Elizabeth, to Richmond street, in the city of Plainfield, and on Orchard street, in the city of Elizabeth, from Westfield or North avenue to Morris avenue, and in Plainfield on Richmond street, from North avenue to Third street; and thence on Third street to Watchung avenue, and on West Jersey street and Bayway, in the city of Elizabeth, from the present terminus of the street railroad on West Jersey street to Westfield avenue, will be received and considered by this board on the 4th day of August 1898, at the hour of half-past two o'clock in the afternoon of that day, at the court-house, in the city of Elizabeth, N. J., in pursuance of an act of the last legislature, entitled 'An act to authorize boards of chosen freeholders to widen, straighten, grade and otherwise improve highways under their control, and to provide for the construction of street railroads thereon,' and that at said time and place all parties interested in said matter may be heard; and be it further

"*Resolved*, That this resolution shall be published in the 'Elizabeth Daily Journal' and the 'Daily Leader,' published in the city of Elizabeth, N. J.; the 'Cranford Citizen,' published in Cranford, N. J.; the 'Union County Standard,' published in Westfield, N. J.; the 'Courier-News' and 'Daily Press,' published in Plainfield, N. J., once in each week until the said fourth day of August."

In response to advertisement under such resolution the following proposition was submitted:

'*To the Board of Chosen Freeholders of the County of Union:*

"The Elizabeth City Horse Railroad Company hereby proposes to construct, maintain and operate a street railroad in Westfield or North avenue, from Orchard St., in the city of Elizabeth, to Richmond St., in the city of Plainfield; also in Orchard St., in the city of Elizabeth, from Westfield or North Ave. to Morris Ave.; also in Richmond St., in the city

of Plainfield, from North Ave. to Third St., and thence in Third St. to Watchung Ave.

" If this proposition is accepted, it is the intention of said company to construct a double-track street railroad in North or Westfield Ave., from Orchard St., in the city of Elizabeth, to Richmond St., in the city of Plainfield, as the same appears widened and straightened on a certain map adopted by your honorable body and filed in the county clerk's office on July 14 last; a double-track street railroad in Orchard St., in the city of Elizabeth, from Westfield or North Ave. to Morris Ave., and a single-track street railroad in Richmond St., in the city of Plainfield, from North Ave. to Third St., and thence in Third St. to Watchung Ave., with a siding in Third St., two hundred feet long, extending easterly from Watchung Ave.

" The motive power to be used on said road is electricity.

" The rates of fare to be charged on said street railroad are as follows [stating the rates].

" The amount of money to be contributed by said company for defraying the cost of improving said public highways, or any of them, as indicated in part on the said map adopted by your honorable body on July 14 last, is $250,000, and interest at 4 per cent. for ten years on whatever sum, if any, said improvement shall cost in excess of said sum of $250,000. Payment of said sum to be made by installments, as required by your honorable body, as the construction of the street railroad proceeds in each municipality.

" The amount to be paid annually for the franchise is $100. [Other terms are then stated.]

" This proposition is made in the expectation that the franchise, if granted, will be for the term of seventy-five years.

" Sealed and respectfully submitted by order of the board of directors of the Elizabeth City Horse Railroad Company, August 4, 1898.

" THE ELIZABETH CITY HORSE RAILROAD CO. . [SEAL.]
        " By JOHN KEAN, *President.*

"Attest: J. W. WHELAN, *Secretary.*"

On August 15th, 1898, this proposition was accepted by resolution of said board.

Upon application in behalf of said board for the condemnation of lands in the township of Union, in said county, necessary for widening of Westfield or North avenue, and after notice and procedure not questioned, the Circuit Court of said county, on October 12th, 1898, appointed commissioners to make an estimate and assessment of damages, if any, that will be sustained by certain landowners named by the taking of the land and real estate described in the application.

Hannah E. Randolph, Cornie G. Bigelow, David D. Irving and William M. Deutsch, taxpayers of said county, apply for a writ of *certiorari* to remove the resolutions of the chosen freeholders and the order appointing commissioners in condemnation. They all own land along the line of Westfield or North avenue, but not in the township of Union. A part of the lands of the first three named will be taken for the proposed widening.

Annie J. Bronson applies separately for a writ of the same purport. She owns land on said avenue in the township of Union, a part of which will be taken for the proposed widening and is included in the proceedings to condemn. By mistake her father, Joseph M. Bronson, is named as owner, but that error is waived.

It is not questioned that the avenues and streets upon which it is proposed to construct a street railroad are public highways under the control of the board of chosen freeholders of the county of Union.

Before Justices LUDLOW and COLLINS.

For the applicants, *Sherrerd Depue.*

*Contra, William R. Codington* and *Frank Bergen.*

The opinion of the court was delivered by

COLLINS, J.   I will present and discuss in convenient order the reasons assigned for the allowance of writs to these applicants.

*First.* The statute is assailed as a local or special law regulating the internal affairs of counties, because in its second section it is enacted that nothing in the act shall be construed to authorize the construction of a street railroad on any public highway on which it is not lawful at present to authorize the construction of a street railroad. It is claimed that thereby the operation of the act is restricted to public highways now existing upon which it is lawful to authorize the construction of a street railroad. It is too plain to need argument that the act will operate on public highways hereafter opened under county control or otherwise subjected to such control. The only limitation is on the power to authorize construction of street railroads where it is not now lawful to authorize their construction. This limitation does not create a *class of counties.* All counties are equally affected by it. All may authorize construction of street railroads upon the highways now or hereafter subject to their control unless such construction is otherwise prohibited. The statute does not remove existing prohibitions, if any there be. We see no objection to that saving clause, although in point of fact no such prohibition has been indicated to us. Probably the draftsman of the act had in mind the restrictions on the location of street railroads contained in the general act on that subject. *Gen. Stat., p. 3220, pl. 55.* It was as competent to preserve those restrictions by indirect reference as by direct insertion in the new act. It is quite clear that an act empowering any county to authorize the construction of street railroads subject to existing restrictions as to their location is a general law. The case falls within the principle declared in this court and affirmed on review, that a general law cannot be deemed special because it does not sweep away other general laws. *Road Commission* v. *Harrington Township,* 25 *Vroom* 274; *affirmed,* 26 *Id.* 327.

*Second.* The power to condemn is challenged because of the direction of the statute that the commissioners in estimating damages shall take into account the benefits conferred by the improvement on the remainder of any lot or tract of land

partly taken. Except as to Miss Bronson this challenge is premature, but she, of course, has a right to be heard. I would not on the complaint of one lot-owner check so important a public work as that projected, even if I thought this objection debatable. If the grant of power to take a part of a lot in one ownership is unconstitutional, the act, except in that regard, is valid, and the proceedings should not be hindered; while, on the other hand, the landowner cannot be injured by permitting them to go on, for any attempt to take such land, if power to do so be lacking, is simply futile. In a case like this I would relegate the landowner to the defensive or at most review the award. But I think that such objection is not debatable in this court. The grounds assigned for it are (1) that under our constitution compensation for private property taken for public use must be made in money, not in benefits; and (2) that the challenged provision of the statute involves an assessment for benefits unequal in character. The case of *Carson* v. *Coleman,* 3 *Stock.* 106, is cited as authority for the first proposition. That decision seems to relate only to general benefits and whether so or not rests on the postulate that compensation must precede the taking. Such is the case where property is taken for public use by an individual or a private corporation, but not where the taking is by the state itself or a public corporation. This difference is apparent from a reading of the two provisions of the constitution (Art. 1, ¶ 16; Art. 4, § 7, ¶ 9), and has been declared by this court. *Loweree* v. *Newark,* 9 *Vroom* 151; *Wheeler* v. *Essex Public Road Board,* 10 *Id.* 291. But in any case the doctrine does not exclude the taking into account of special benefits to lands a part of which only is taken, for those are as much involved in the ascertainment of the just compensation of the constitution as are the damages to such lands. How that compensation shall be paid is another matter. That such benefits may be so taken into account has been declared in many cases in this court. Such declarations in *Swayze* v. *New Jersey Midland Railway Co.,* 7 *Vroom* 295, 299; *Butler* v. *Sewer Commissioners,* 10 *Id.* 665, 669, and *Crater* v. *Fritts,*

15 *Id.* 374, were indeed *obiter dicta,* and perhaps may not be sustainable in their full extent when applied to a taking by a private corporation; but the decision in *Loweree* v. *Newark, ubi supra,* is explicit as to a taking by a public corporation. In that case it was held that the legislature may constitutionally provide that an assessment for benefits arising from a street opening shall be set off against any award for land taken.  This case was followed by a decision directly sustaining the right to consider special benefits on such a taking and disallowing the second ground of objection urged against the statute *sub judice.*  The case is *Mangles* v. *Chosen Freeholders,* 26 *Vroom* 88.  The statute involved authorized the opening of a public road and directed the commissioners "to make a just and equitable estimate and appraisement of the compensation and damages each owner of the real estate and land to be taken will sustain by reason of such taking, considering in such appraisal the condition in which each owner's parcel will be left after taking so much thereof as will be necessary for said opening and the benefits that will result from such road to the owner or owners of such land and real estate."  No assessment of benefits was authorized, but the cost of the improvement was to be borne by the county at large.  In laying the road existing highways were widened, in many places on one side only.  Prosecutors a part of whose land was taken urged, exactly as in the case now before us, that special benefits could not be constitutionally considered in estimating compensation for property taken, or at least that a law providing that they should be considered where part of a lot was taken and not providing for an assessment upon all property benefited was unconstitutional. This court construed the statute as extending only to present special benefits resulting from the mere legal opening of the road and held that the adopted method of ascertaining compensation to the landowner was not only constitutional but that in no other way could *just* compensation be ascertained. In delivering the opinion of the court Mr. Justice Dixon said : "Just compensation for taking part of an entire tract

of land for public use cannot, we think, be ascertained without considering all the proximate effects of the taking. These are the withdrawal of the part taken from the dominion of the former owner, the damage done to the residue by the separation and the benefit immediately accruing to the residue from the devotion of the part taken to a public use. Just compensation is ascertained by combining the pecuniary value of all these facts; if any be excluded, what is given is more or less than is just. The value of the land taken is no more essential to just compensation than is satisfaction for the damage done to the residue, nor is it more exempt from diminution on account of the benefits conferred." This reasoning seems to us unanswerable. Equally satisfactory is this decision as to the second ground of objection of these applicants. Then, as now, it was argued that the right to assess land for benefits arising from municipal improvements is a branch of the taxing power not delegated to the commissioners, since they are not authorized to levy such an assessment, being merely agents in the exercise of the power of eminent domain; and if all such benefits be charged, against the value of land taken and damages, under the latter power, the owner of such land will pay a greater portion of the cost of the improvement than would be exacted of him under the taxing power, while upon the owner of other lands, sharing equally in the advantages, no special burden will be imposed. It was, and is now, urged that an award made under such conditions cannot be just. On this subject the learned judge said "that a right to charge landowners for special benefits conferred by a municipal improvement pertains to the taxing power does not prove that a similar right may not belong to the power of eminent domain. Sometimes the same result may be attained by force of different branches of the sovereign prerogative. Thus, private property may be taken for public use under the police power, or under the war power, as well as under the power of eminent domain. And circumstances may readily be supposed in which the legal claim of the owner for compensation will depend upon the election of the

government as to which power it will exert for the accom-
plishment of its ends. Under the taxing power itself, bur-
dens of very different weight may be laid upon different
persons for similar benefits, at the option of the legislature.
The expense of opening one street may be met by general
tax, the expense of opening another by special assessment.
Hence there is nothing abnormal in the fact that in opening
a public road a heavier burden may be laid upon a landowner
who comes within the reach of eminent domain than may be
upon one whom the power of taxation only can affect. Nor
does this inequality of burden render the award for property
taken unjust. The parties to this transaction are the public
and the landowner. Between them the compensation allowed
is just. The generosity of the public towards other owners,
sharing in the benefit without the burden, does not affect him
whose land is taken except as it affects all other members of
the community. No doubt, if the law had directed that the
power of eminent domain should be employed conditionally,
on payment for the land taken and damages without deduc-
tion for the benefits, and that special benefits should be
assessed under the taxing power, more even-handed justice
might have been done, but as it directs that the eminent
domain be exerted in full constitutional force, on making
compensation deemed just in view of benefit as well as detri-
ment, it is for the courts merely to see that the legislative
mandate be obeyed."

Counsel for the applicants concede that this decision, if
applicable in this case, is directly counter to his claim, but
argues that there is a distinction that renders it inapplicable.
He contends that the benefits to be taken into account as con-
ferred by the improvement include those resulting from the
construction of a street railroad, but it is clear to us that such
is not the case. The word "improvement" in the connection
in which it occurs in the first section of the statute signifies
only the "proposed widening, straightening or change of
location" of the highway shown on the filed map. The
construction of the street railroad is a matter of independent

and, it may be, subsequent consideration. The power of the freeholders to improve the highway does not depend upon their ability to secure the construction of a street railroad thereon even if an intention to do so is a prerequisite to the exercise of such power, which I by no means admit. The act imposes many conditions precedent to the construction of the railroad. It will not do to say that these must all be met before the highway can be widened.

It is further urged that we should allow the writs in order that the court of last resort may review the Mangles case. To this rather novel suggestion we can only say that we think that decision correct, so that not only are we confronted by the doctrine of *stare decisis* but also by our own deliberate judgment that there is no debatable question on that head. Under such circumstances the allowance of a writ would be, not the exercise of sound judicial discretion but an arbitrary act. It is suggested that the Mangles decision was inconsistent with the views previously expressed by Chief Justice Beasley in an opinion reported in 9 *N. J. L. J.* 333, for November, 1886, in the case of *King* v. *Duryea,* decided by the Court of Errors and Appeals at March Term, 1886, and reported without opinion in 19 *Vroom* 372. The decision reversed a judgment of this court upon an opinion reported in 16 *Id.* 258, and implied the invalidity of a statute there interpreted. The reason assigned by the Chief Justice for such invalidity was that the taxing power had not been exercised in accordance with constitutional requirements as defined in the Agens case and other decisions in two particulars, viz., first, the burden imposed had been unequally distributed upon lands of the same class, and secondly, the distribution of a special credit in the assessment had been left to the will of the commissioners as to what lands should receive its advantage, without any standard being provided in the law itself. This deliverance does not bear upon the points decided in the Mangles case.

*Third.* The resolution of July 14th, 1898, is attacked because it declares an intention to " otherwise improve " Westfield or North avenue without disclosing the nature of the

improvement. It will be time enough for such disclosure when steps shall be taken to effectuate the intention. The resolution affords the necessary support for the advertisement for propositions to construct and operate a street railroad. Direct corporate action will be needed for any improvement of the avenue to be undertaken by the county under section 4 of the act.

*Fourth.* Said resolution is also attacked because it does not give information of the matters to be stated in the propositions to be submitted thereunder. This was not necessary. The statute expressly directs what shall be stated in the resolution, and its publication is all the notice required. The statute itself—referred to by its title in the resolution—gives the requisite information of what the propositions must contain.

*Fifth.* The contract with the Elizabeth City Horse Railroad Company is attacked upon the assertion that that company is without legislative authority to construct or operate a street railroad on Westfield or North avenue outside of the city of Elizabeth. Assuming this and assuming that the act of 1898 does not supply that authority to *any* person or corporation contracting with the county, we cannot see that the applicants for this writ have any standing to impeach the contract. The county has ample power to provide for the construction of the railroad and if it does so by contract even with a corporation having otherwise no authority to operate it, the railroad will not be a nuisance and no private right of any landowner will be invaded. It is claimed that as taxpayers the applicants have an interest to be heard on this question, and we are referred to the case of *Lewis* v. *Freeholders of Cumberland,* 27 *Vroom* 416, as a precedent. That case upheld a *certiorari* by a taxpayer removing a resolution of a board of chosen freeholders permitting the use of a bridge by a railway company in a specified way, when the company was without legislative power to operate its road in that manner. It was shown that there was danger of injury to the bridge, and this court held that a taxpayer who was subject to taxation for the maintenance of the bridge might invoke a review of the

municipal action because it might lead to such taxation. In the case in hand it is evident that the contract with the railroad company is beneficial to the county and cannot lead to increased taxation.

The applications are denied, with costs.